Sherwood, J.
The foregoing statement of the controlling facts in this case furnishes a sufficient basis on which to ground the following remarks and expression of our views on the salient points presented by this record, and the briefs and arguments of counsel.
1. And first as to the jurisdiction of this court to entertain and determine- proceedings of this’ character. On this point it would seem there can be no room for two opinions. All courts having power to admit attorneys to their bar, possess as a necessary and inherent incident of such power, the right to disbar them for unworthy behavior. The authorites in this regard will be found collected in the brief of relator. The proposition, however, is too plain to require the. citation of authorities in its support. The majority and minority *296 opinions in Mullins’ case, ante, p. 231, both, concede the correctness of this position.
Taking for granted then the jurisdiction of this court to proceed as above indicated, that such power is inherent, and results of necessity from our organization and attributes as a court, it is unnecessary to inquire whether the legislature has conferred any power on us to suspend or remove an attorney. If it has, we may act under that; if not, then under that which exists regardless of legislative aid or action.
2. And doubtless it was entirely'competent for the attorney general to institute this proceeding. This stands admitted in the majority opinion as well as in that of the minority in the case just, mentioned. Indeed, the authorities cited by relator establish not only this position, but that any member of the bar may put in motion such a proceeding, and that a court in the exercise of its inherent power may require of any member of the bar as a duty, the institution of proceedings looking to the disbarment of another member of the same bar.
3. The charges made by the attorney general against A. Q-. Knight are in substance these:
a. That, taking the typewritten transcripts of the evidence furnished by the stenographer "in Howell’s case, he mutilated and falsified the same or permitted the same to be done by removing therefrom the correctly transcribed testimony of divers material witnesses actually taken at the trial, and in lieu thereof, substituted and inserted false and forged statements that had not been testified to by said witnesses; that after such fraudulent mutilation and substitution, he delivered the false and mutilated transcript to the trial judge, as and for a correct transcript of the evidence, thereby misleading and deceiving him into approving and signing the same as the bill of exceptions in the ease of *297 Howell; that, after being signed, lie delivered the false bill of exceptions to the clerk of the trial court, who, deceived by the fraudulent acts aforesaid, forwarded a transcript of the false bill of exceptions to the clerk of this court.
b. That in similar manner he withdrew the bill of exceptions after its signing and filing and added to the process of mutilation and falsification.
c. That in his abstract of the evidence and brief, and in the printed argument in the ease referred to, he knowingly and fraudulently made false statements touching the true testimony of divers witnesses named in the bill of exceptions, for the purpose of misleading and deceiving this court and thereby securing a reversal of the judgment against his client. The testimony taken herein, establishes the truth of the above charges in respect to everything except clause b.
After the close of the argument here, by permission of the court, A. GL Knight arose and made the following confession:
“In view of the evidence in this proceeding, I desire to make a statement. I know nothing of the law; that branch of it has been discussed in briefs. In regard to the preparation of the bill of exceptions, I have told all I have done. Eor a time I was charged with forgery and perjury, but that charged has been virtually abandoned. It is some consolation to know they have been wiped away. What I have done I do not say was right. I realize that it was not. This was my first murder case, and so far as I am concerned it shall be my last. The other members of the profession can have the rest. I allowed my zeal in this case, which was a big one, to overcome my judgment.
“I prepared a bill of exceptions that was not true. I have always admitted this. I have always told the truth about it as my affidavit and deposition will show. *298 However, I did not originate it. As to the stenographer’s law I knew nothing. We had none in our circuit. In this case the judge brought his with him. The law had been enacted only a few months before. We had always prepared bills of exceptions in our own way and presented to the judge to pass upon it. I may have wofully deceived the attorneys on the other side, but I am not charged with that. I don’t say that is right. I see my mistake now. This has caused me much pain and money out of my own pocket that I am ill able to bear. I paid the expenses of the old mother of the boy, traveling expenses back to her home in Ohio and other expenses. But I don’t care for that. I will undergo any punishment that this court may mete out to me, whatever it may be. But I ask your Honors not to run the plowshare of ruin over me. As much of my honor as I have left, I hope the court will leave me as much as it can. I trust it will not be too severe upon me.”
4. Having disposed of the case of Knight, for the present, we turn to that of E. M. Harber, the other respondent who was jointly charged with Knight in the perpetration of the unprofessional conduct aforesaid, but has been temporarily separated from 'him for convenience of treatment. A careful reading of the testimony contained in this voluminous record, a mere outline of which has heretofore been given, leaves no room to doubt that E. M. Harber is also guilty of at least one of the charges preferred against him, to wit, that of preparing an abstract of the evidence and brief and printed argument in Howell’s case, on what he knew to be a falsified, fraudulent and mutilated bill of exceptions, with intent and purpose to mislead and deceive this court, and thus secure a reversal of the judgment against his client. It seems Harber was the chief preparer of the brief, etc., filed in that case in this court.
*299 In order best to illustrate the pertinacious and pernicious thoroughness which characterized the industrious endeavor to deceive this court in regard to the truth of the matter involved in that record, the abstract of the evidence, the brief and argument prepared by Harber and his associate respondent are here copied: ,
“The nature of some of the points on this record are such as to compel an examination of the entire evidence, and hence any attempt at an abridgment or abstract of the record would be futile, unless we print the entire evidence. It is too' voluminous for this. We desire, however, to set, forth some extracts from the evidence and record, believing that it will the better enable us to clearly present our points, and be of some convenience to the court.
“Extracts of the evidence, on the question of the identity of Nettie Hall, and the corpus delicti.
“James Hall testified:
‘ ‘ ‘The family of Mrs. Minnie Hall, on the nineteenth day of January, 1889, consisted of herself, Willie, a boy right close to eleven years old, not quite, next a little girl by the name of May, right close to nine years5 old, and Nettie was the next one, not far from six years old, am not certain about it, and Eoy, about three years old.’ (Bill of exception, page 2.) It is to be observed at the outset that the above is the only place in all the evidence where even the name of Nettie Hall appears, the person charged to have been killed, ‘ * * * On the east side of the house forninst the cellar door, I think was one of the little girls. She was badly burned. Dead. * * * In fact, all charred. Her head was thrown back. She had long curly hair, and part of the hair on the back of her neck wasn’t burned. Yes, sir; I made an examination hurriedly, nothing more. I think it was on the left side; I am not certain. There seemed to be a piece knocked right off from her *300 head, and her head was open from that back. * * * Yes, sir; before I saw this child T went clear around this building twice.’ Q. ‘I’ll get you to state to the jury if you saw the remains of any of the rest of this family that night or the* next day.’ A. ‘No, sir; I never saw anything but a piece of— Oh, I saw some little pieces of them when we were working in the cellar. We dug the cellar all over, and occasionally we found some small pieces of bones, amongst the rest, a piece of skull that come off -of the forehead, a little piece about as big as a dollar.’ (Bill of exceptions, pp. 9, 10, 26.)
“R. N. Vorce testified:
“ ‘And there was a short space betwixt this bed and that bed, and Mrs. Hall was right there in that space. She was right there, and I started right out here two or three rods or such a matter. There was a clothesline tied to a tree. I tried to get it and couldn’t, but there was a pole standing under the line, ten feet long maybe. I took that pole and Smith and I got it under her here, you know, and tried to get her out. But she was very heavy. It seemed as though she was kind of stuck. We couldn’t raise her up. And just then the floor gave way and under the floor the cellar here, there had been some posts set under the joists through the center, and as the floor gave away here it went that way and left a space here right down to the ground, and here was the cellar door, and right there after it fell in, one of the little girls fell, right opposite this cellar door, right down there. * * * Mr. Smith and I caught around her and pulled her out. * * * She was all afire. We pulled her out and I took my hands and gathered up some mud and water down there and threw .on her to put the fire out. * * * Well, I saw one of the children lying on the foot of the bed. On the foot of that bed I saw Mrs. Hall; there she was; *301 she seemed to be down on her knees; head drawn in that way. The flesh was all torn from her skull. It was as white as chalk. There was a gash cut right in the head. * * * The head of the little girl we got out was cut right off here, and lopped back, and part of her skull open and was gone, and part of it lopped over back, and the hair was burned off; but I saw her hair burn off after she fell into "the cellar. Her mother had kind of — was over here. I didn’t see her until after she fell into the cellar. * * * Got down in the cellar, poured some water down there and put some boards on the debris and fished and got the bodies out that wasn’t burned up. * * * Mrs. Hall’s head was burned off; her limbs were burned off; her arms and legs were burned off; she was all burned up. The condition of the children I saw taken out— well, was nothing but mere little scraps of bones of the two that was in there.’ (Bill of exceptions, pp. 60, 62, 64 and 65.)
“C. J. Ran ah an testified:
‘ * * * Looked over the remainder of the bodies that was left of the people that was burned up there. * * * I examined all of them. * * * Well, the bodies were all burned. There was only just the back bones left of two of the bodies; the supposition about the boy — * * * well, then, I believe one of the bodies was'burned from a little above the knees. That is, the limbs were burned off, the remains burned off, the legs, arms and breast and head, and about all the bowels, was burned out and the skull broken right across, and the fore part of the skull was gone, and the flesh was all burned, and the face, the bones of the face was left, but the flesh was all burned, crisped, and the hair and part of the.scalp was left, and the remainder of the skull that was there — the fire had penetrated the edges of it. I was on the jury (wit *302 ness meaning coroner’s jury)-. I examined the bodies closely, to see if a knife or bullet or anything had cut them. I found there was nothing went through the brain at all. All that was gone of it was the fore part of the skull, and the hair was left there with blood enough to preserve it from the fire, I expect. * * * The rest of it ‘there was cracked — there was a crack, it .appears to me, that the center of the skull was just a trifle open, kind of open; looked like as though it had been broken from a stroke of some instrument of some kind and broke the skull.'’ (Bill of exceptions, pp'. 80 and 90.)
“Dr. Pettijohn testified:
“‘There was only one body that I saw, that apparently the body of the mother. I did not see the remains of the other persons. That body as it lay in a box, or some such receptacle, on a sled, was in a bent position so that only the trunk was visible. That was in a badly burned condition. The top part of the skull was absent, the face was badly burned, the cartilages burned, nothing left but the lime. The muscular tissues almost entirely destroyed. It was impossible to recognize by the features what the body was.’ (Bill of exceptions, p. 102.)
“Dr. H. H. Pratt testified:
“ ‘ * * * I examined one that was supposed to have been the body of the mother, and that is about all. The bowels, abdominal walls, were burned, destroyed; part of the fore part of the head was gone and the brain exposed and the arms burned off and the hips burned bare, and the face burned; general destruction was the result. The other remains that were there I did not examine specially. I saw they were human remains, that was all.’ (Bill of exceptions, p. 113.)
*303 “Gr. R. Critchfield testified:
“ ‘Well, when I got there * * * one corpse was lying on the seatboard of a wagon in the yard, so we went to work and got as much as we could of the other bodies that wasn’t burned up.’ (Bill of exceptions, p. 174.)
“Henry Smith testified:
“Well, we discovered Mrs. Minnie Hall was in the northeast corner of the building, in the bed-room. * * * Well, right here was Mrs. Hall lying there. Looked to be part of her body on the bed and part on the floor. * * * We tried to pull her out. While we were trying to pull her out on the east side, there was a cellar door that threw one of the little children in front of the cellar door. We got a rod. '* * * The little girl when we took her out looked like she had been hit in the head with something; the skull was cut apart and the top of the scalp was laid back to the back part of the neck.’ (Bill of Exceptions, pp. 222 to 226.)
“In addition to the foregoing evidence, the state introduced witnesses J. A. Pratt (p. 123), Dr. D. C. Orr (p. 372) and John C. Moore (388-9) — , to prove certain alleged confessions of defendant. But it will be observed there is not in all their evidence one word with reference to the alleged homicide or death of Nettie Hall, but that the same has reference solely and specifically to the homicide of Mrs. Minnie Hall and one of her little boys.
“In the foregoing extracts we have taken the most favorable evidence for the state on the question of the homicide or death as well as the identity of Nettie Hall. In fact, in the foregoing will be found substantially all the evidence introduced at the trial of these subjects.”
*304 The following is all that portion referring to the cross-examination of defendant complained of, as it appears in said exhibit:
“CROSS-EXAMINATION OF DEFENDANT.
On the examination of D. C. Orr for the state he testified (page 373):
“Q. I’ll get you to state what conversation, if any, you ever had with the defendant Howell in regard to the murder of Mrs. Minnie Hall; state it in full, to the jury, if any. A. Well, there was several conversations. I had three or four conversations in regard to the matter. Do you want me to state what I know about it?
“Q. Fully what you know about it? A. In the first place he said he was in considerable trouble, and I was in trouble, and we sympathized with each other, but he wrote me some letters. * * *
P.374: “Q. Doctor, what did you do with these letters? A. I turned them over to Denbo, the sheriff.
“Q. Was there anything else besides these letters he gave you? A. A key.
“On examination of Henry Thornton, a witness for defendant, he testified (p. 548):
“Q. Did you see him (Howell) the night before he was arrested? A. I seen him in Brookfield, sir.
“Q. About what hour? A. I seen him half-past nine o’clock. * * * p. 558.
“Q. Did he offer you a cigar? A. He asked me to go and have a cigar. I said no.
On cross-examination of defendant, and against his objections and exceptions, he was compelled by the court to testify, (p.479).
“Q. And while’ in jail wrote letters to Orr, asking him to aid you to escape?”
Defendant objects, because said matters were not referred to by him in his examination in chief. Objection overruled and defendant excepts at the time. A. Yes, after I had been convicted I wanted to escape.
“Q. Did you not give Orr a key you had made, that he might assist you to escape?
“(Defendant objects same as above). Objections overruled and excepts.
“A. I gave him a key. Yes, sir.”
On the cross-examination of defendant he was compelled, against the objections and exceptions of his counsel to testify (p. 435):
“Q. That was the only mortal you spoke to from nine till two? A. It was not.
“Q. Then you spoke to Henry Thornton and gave him a cigar?”
Defendant objects on the grounds that he was not examined about nor did not refer to such matter or to Henry Thornton in his examination in chief. Objections overruled. Defendant excepts at the time. A. No, sir.
“At the time of defendant’s arrest a certain link, claimed by the state to be a deadly weapon, and the *305 possession thereof a suspicious circumstance against him, was found upon his person. Defendant had testified in chief, explaining his possession of said link, and upon cross-examination he was asked (p. 475):
Q. Did you say one word about taking that link for the purpose of giving it to Henry Smith, on either of the former trials of this case?
“Defendant objects to said question because not proper cross-examination, and because he was not examined in reference thereto in chief. Objection overruled and defendant at the time excepted.
“A. I can’t say.
UQ. Are you prepared to deny it?
“Same objection, ruling and exception as above.
11 A. I can’t say I am.
“In very many other respects, on defendant’s cross-examination, his rights were disregarded, and he was, against the objections and exceptions of his counsel, compelled to testify about matters of which he had not been examined in chief. This will be readily noticeable by the court, upon the inspection of bis cross-examination ; and while we do not wish to be understood as waiving any objections made and preserved thereto, we deem the foregoing, wherein he is compelled to corroborate the state’s witness, D. C. Orr, and to contradict his own witness, Henry Thornton, and show his lack of memory as to his former testimony on the trial of this cause, to be so glaring and such an abuse of the rights of defendant, guaranteed to him by both constitution and statute, that a further or more specific reference thereto is unnecessary.”
In the brief (Points and Authorities) the following statements are made and points urged for reversal, referring to the proof of the death or identification of Nettie Hall:
*306 “Points and authorities:
(1) “The evidence on the trial does not establish the alleged homicide or death of Nettie Hall, the person charged in the indictment to have been killed and murdered by the defendant.” (Citing numerous authorities.)
(8) “There is not sufficient evidence, in fact there was not even a scintilla of evidence, to justify or support a finding that Nettie Hall was dead, or that any of the remains were identified as her remains, and therefore defendant’s instruction that ‘under the law and the evidence the jury must find the defendant not guilty,’ should have been given and the defendant acquitted; he is therefore entitled to his discharge here. (Citing authorities.)
In the brief, referring to the cross-examination of defendant, his counsel said:
(2) “The cross-examination of defendant was unwarranted by the law or facts. The law permitted no cross-examination of him upon matters of which he had not been examined in chief; he was not examined in chief in reference to what he had sworn upon any previous trial of this case as to the giving or writing of any letters to Orr or the giving of a key to said Orr. Nor was he examined in chief concerning one Henry Thornton, the seeing of, or giving or offering him a cigar. We doubt if a more flagrant disregard of the defendant’s rights can be found in the books . than appear in this.”
“Argument.
(1) “The allegation of the indictment ‘that Nettie Hall is dead,’ was unproven at the trial. As we understand the law, the very basis of a corpus delicti is the proof that the person charged to have been slain is dead, and that the discovered body or remains be identified as those of such alleged deceased persons, *307 before the next step in the process — i. e., the criminal agency of defendant in such death — becomes important; or as it is sometimes put, ‘beyond the death and the violence remain the two inquiries to which the ascertained criminal fact gives rise: who is the slain and who the slayer? the identity of the one and the agency of the other. It is therefore incumbent upon the state to prove that Nettie Hall was dead; that she came to her death by violence; and the defendant’s criminal agency in producing such death. That the last two of the above propositions may be proven by circumstantial evidence we concede; but grave doubts arise as to whether the first of said propositions, to wit, ‘the death of Nettie Hall,’ can be proven by circumstantial evidence at all or not. * * *
“But, conceding for the sake of argument, that it was competent to prove the ‘death of Nettie Hall’ by circumstantial evidence, and the state is in no better position on this record. For any decision or text-writer that has held to the doctrine that such fact may be established by circumstantial evidence has invariably required that ‘the proof of death be so strong and intense as to produce the full assurance of moral certainty,’ or, as otherwise stated, ‘where presumption is intended to be raised as to the corpus delicti, that it ought to be strong and cogent.’ In the light of this rule, let us examine the probative force of the state’s evidence: Nettie Hall is shown by the state to be at her mother’s house about three weeks prior to the alleged burning of such house on the nineteenth of January, 1889. This is shown by witness Henry Smith, who says on Sunday about three weeks prior to the nineteenth of January, 1889, he was at the house of Mrs. Minnie Hall, and that ‘the children were all there.’ (See Bill of exceptions, pp. 226-241.) When thereafter does the state even undertake to account for the where *308 abouts of Nettie Hall? They are content to leave this important question to conjecture. Was she in Missouri on the night of this tragedy, or in Kansas with the junior James Hall?”
“But it is shown by the defendant in his evidence that Mrs. Minnie Hall and her children were at her father’s (their grandfather’s), at Sumner, Missouri on the Sunday before the burning of this building. (See defendant’s evidence, p. 429.) This is uneontradicted by any witness and must be taken as true; if not true, it was easily within the power of the state to have contradicted it. Where was Nettie Hall on the night of January 19, 1889? Had .she returned from her visit with her grandfather’s on the Sunday before? No witness so speaks. Indeed, if the facts and circumstances in this record tend to show anything on this question, they tend to show that the remains of but one little girl was ever found in the ruins of this building, for B. N. Vorce and Henry Smith say that one of the little girls fell right opposite the cellar door, and that they pulled her out in front of the cellar door'; and when it is remembered that this was done before the arrival of James Hall at the building, and that when he arrives he sees one of the little girls on the east side of the house against the cellar door, it is inferable that she was the same little girl that Yorce and Smith had pulled out previous, as but one little girl had been rescued or but the one lain by the cellar door. It is not shown what the size of Nettie Hall was. No witness says that he knew her, or any of the bodies rescued resembled her. Not even a ventured guess by any witness that Nettie Hall was of the dead. The color of her hair, the kind of clothing, the personal marks of identity, if any, teeth, form or shape, is all left entirely so to conjecture by this record. It is not even shown that search or any inquiry was ever made by any *309 person for Nettie Hall. In fact, “all the circumstances, proved by the state may well exist and still be entirely consistent with the fact that Nettie Hall was never murdered and that she is still alive.” It may well be doubted if this record discloses a single substantive fact capable of raising even a suspicion that Nettie Hall is dead, much more is it wanting in that chain of facts and circumstances so universally required, and dominated by the law as being ‘cogent and convincing, and excluding all other reasonable hypothesis.’ ‘Mere suspicion, however strong, will not supply the place of evidence, when life or liberty is at stake.’ * * * On the eighth point of our brief, we deem it only necessary to quote as follows: ‘The evidence for the state having been insufficient in law to make out the offense charged in the indictment, the defendant was entitled to a verdict of not guilty at the hands of a jury. He can not, therefore, on well-settled principles, be subjected to another trial, but must be, by the judgment of this court, put in the position in which the verdict and judgment of the court below should have put him.’ ”
In reference to the cross-examination of defendant, counsel said in their printed argument: (5) “The cross-examination of defendant is so flagrantly in violation of the statute, that we have thought it unnecessary to make any further comment upon it than made under our points and authorities, until our attention was called to the recent promulgation of this court in the case of the State v. Avery, 21 S. W. Rep. 199. In that case the court, speaking through BunaESS, Judge, sustains the cross-examination of defendant as proper ‘for the purpose of showing that the man Thompson was no other person than the deceased, whom defendant had testified killed himself, and came within the express provisions of the statute, confining the *310 cross-examination in cases of this kind to the examination in chief.”
“But the learned judge goes further and says: ‘It was also competent for the purpose of laying the foundation to contradict him.’ This last paragraph is not sustained by any decision in this state, and . must be considered as mere obiter dictum. In fact, the rule in this state is directly to the contrary. The cases cited by the learned judge on this proposition, hold the contrary without an exception. In the case of the State v. West, 95 Mo. 140, quoted, the cross-examination of defendant was sustained on the grounds of eliciting information concerning a matter about which defendant had testified in chief, i. e., ‘the state of his mind.’ Judge Bhace, in speaking for the whole court and after quoting the statute, says: ‘R. S. 1879, sec. 1918. If the defendant, testifying in his own behalf, may be contradicted and impeached the same as any other witness in the ease, he is liable to have his credibility impeached by proof of former inconsistent statements. State v. Brooks, 92 Mo. 542; 1 Greenlf. Evid., sec. 462. The inconsistent statements, however, that can be shown for this purpose on his cross-examination, must be confined to those made concerning a matter referred to by him in his examination in chief.’
“Such has been the constant interpretation of this statute, and it is indeed susceptible of no other construction. By plain statutory provision ‘he shall be liable to cross-examination as to any matter referred to in his examination in chief.’ There is nothing ambiguous or uncertain in the language. It is clear that it was the intention of the legislature to prohibit the cross-examination of a defendant about any matter not referred to in his examination in chief, and so it has been continuously, and without a single departure, held, until the decision in the Avery Case. But it is *311 claimed warrant is found for this departure in the fact that the statute permits the defendant to be contradicted or impeached as any other witness. Those are no new words, but have been a part of this statute since its enactment, and we repeat, no such construction was ever before given them, as given in the Avery case.”
“We do not question that where a defendant becomes a witness he puts in issue his general character, and that it may be attacked, impeached, the same as any other witness; until he has become a witness, no evidence can be admitted to impeach him. Nor do we question that when a defendant becomes a witness and his testimony is in anywise materially different from his previous statements, such statements may be shown; but it is not at all necessary to the contradiction of the defendant, by showing such previous inconsistent statements, that he be cross-examined in reference thereto, his attention called to the time and place of making the same. He is the party at interest, and any statement he has made against his interest, or in contradiction of his testimony, may be shown, and in order to so do, it is not necessary to ‘lay any foundation.’
“The error of Judge Btjbgess in the Avery case is apparent, and is indeed a very natural one. He assumes that before the defendant can be contradicted by showing statements inconsistent with his testimony, his attention must be called to such statements, the time and place of making same, for he says, in justification of the cross-examination of defendant, ‘it was also competent for the purpose of laying the foundation to contradict him.’ We repeat, it is entirely unnecessary to lay any foundation, to call any party at interest attention to any admissions or contradictory statements in order to the introduction of such state *312 ments; keeping this distinction in view, full force and effect can and has always been given every provision of this statute, but to ignore the inhibition against the cross-examination of defendant about the matters not referred to in his examination in chief, or to permit such examination under the pretext of ‘laying a foundation for his contradiction/ renders worse than useless such statute. It, in fact, by judicial construction, turns a legislative enactment, which was intended by the legislature as a protection and benefit of defendant, into a delusion and a snare. What kind of cross-examination must there be that can not be justified on the pretext that ‘it was for the purpose of laying the foundation to contradict him?’
“The case at bar furnishes a good illustration of the fallacy of this claim. Prior to defendant being introduced, one Orr had testified that defendant had written him, Orr, some letters, asking him, Orr, to assist him, defendant, to escape. That defendant had also given him, Orr, a key, that he, Orr, might aid defendant to escape.
“On the cross-examination, of defendant, he was asked about the writing of the letters and giving of the key to Orr, to aid him to escape, and though he had not mentioned such matter, or even Orr, in his direct examination, he was compelled by the court to answer such question, and thus contradict one of the state’s witnesses on a vital and important point. He was compelled to admit the damaging facts testified to by Orr. In these particulars and upon what pretext can this cross-examination be justified? Can it be said, you had to admit it and are therefore not hurt; or that you were being quizzed for the purpose of laying the foundation to contradict you? For if you had denied these statements of Orr, Orr would have been recalled, and contradicted you. The effect of this would be, in *313 all cases where defendant- becomes a witness, he can be compelled to corroborate the state’s witness, or if he fail to so do, contradicted by them, and such cross-examination justified. Not on the grounds of compelling the defendant to corroborate witnesses on material facts against him, but if the reasoning in the Avery case to be followed on the assumption that he would deny such facts, and was being asked in reference thereto that he might be contradicted. But suppose, as in this case, defendant is compelled to corroborate, to admit the damaging facts testified to against him, we ask in all seriousness upon what ground can such cross-examination be justified. The competency of such cross-examination, can not justly be made to depend upon defendant’s answer, but if, in making answer, he is compelled to give evidence against himself, admit the damaging facts testified to by other witnesses, then no contradiction can be had, but if he denies such conversation (or facts), then it is said the examination was proper to lay the foundation for his contradiction.
“On the further cross-examination of defendant, and before one Henry Thornton was examined, the state (evidently having been posted as to what the testimony of Henry Thornton would be in reference to thetime of his, Thornton’s, seeing defendant and offering him a cigar, and desiring to break the force thereof in advance), asked defendant, on cross examination, and he was compelled to answer that he did not see Henry Thornton and give him a cigar on the night of the alleged tragedy, and this, too, though no mention was made of Henry Thornton by defendant, in his examination in chief. When Henry Thornton was examined he testified to the seeing of defendant upon the night mentioned, and defendant’s offering him a cigar. Then defendant is compelled to advance to contradict his own witness; was this in order to lay the *314 foundation to defendant’s contradiction? It was certainly improper in any view of the case.
“Not content with making defendant corroborate D. O. Orr, one of the state’s witnesses, ‘who comes dripping with slime,’ and contradict in advance his witness, Henry Thornton, the state proceeds, with the consent of the court and against defendant’s objection, to cross-examine him about what he had previously testified on the trial of this cause. Why this? Did the state desire to show defendant’s lack of memory, create the impression with the jury that he was testifying differently from what he had previously testified, without daring to give him the benefit of his previous testimony, or was it for the purpose of laying the foundation to contradict him? This was unnecessary and highly improper. All that he had said in his previous testimony or in reference to this ease was competent, and no foundation was necessary to be laid to warrant its admission. The dictum in the Avery case, before mentioned, can not stand, and this court should take the first opportunity to express its disapproval thereof. The cross-examination of the defendant in the case at bar on the matter mentioned, and others that might readily be suggested, can not be justified by any legitimate process of reasoning, due regard being given to the constitutional and statutory rights guaranteed to a defendant on trial for his life.
“The evidence in this cause being, as it is, clearly insufficient to establish the death of Netty Hall, we might well have contented ourselves by simply calling attention thereto, and our confidence in this point is our excuse for not mentioning, in this argument, points fatal to the action of the lower court, to which attention is called under our ‘points and authorities.’ But the action of the lower court in overruling defendant’s application for a continuance, by reason of the state *315 admitting the statement of ¥m. Adams as his evidence, and in admitting evidence of defendant’s attempts to break jail after his conviction, and the giving of instruction number 9, calling the jury’s attention specifically to said attempts, and the unfavorable presumption to be drawn therefrom, without mentioning the fact that he was then under sentence of death, or telling them that they might take that fact into consideration, in determining what weight should attach to said attempts, as well as its action in giving instruction number 4, by which defendant is singled out and the jury virtually told to view with suspicion (and disregard, unless corroborated) his evidence and the cross-examination of defendant, are all so far-reaching in their effects, and grossly improper, that we deemed it our duty to call the attention of this court thereto, that it might set right the .dictum in the Avery case, and express its disapproval of the action of the nisi prius court on the other matters mentioned, and this we trust the court will do, even though it does, as we respectfully submit it must, hold the evidence insufficient, and order defendant discharged.
“Respectfully submitted,
“A. W. Mullins and Hakbeb & Knight, “Attorneys for Defendant.”
More conspicuous evidence of the guilt charged than is furnished by these papers, and by the admission by Harbor that he prepared, or assisted in their preparation, knowing that the statements they contained in reference to the corpus delicti, and the cross-examination of Howell, were utterly false, could not in reason be demanded; the evidence is conclusive and amounts to absolute proof.
Our statute require that a person on his admission to the bar shall take the constitutional oath, and further, “An oath that he will faithfully demean him *316 self in his practice, to the best of his knowledge and ability.” R. S. 1889, sec. 608. What is such faithful demeaning himself in his practice, is to be determined by the adjudicated eases and by legitimate deductions from the principles they announce. No court has yet ventured by anticipatory utterance to declare and define the precise boundaries of an attorney’s professional duty, or what would constitute a breach thereof. A court would not venture to do this in advance, any more than it would venture to foreshadow and define the precise limitations and description of a word which, as the representative of a fact, constitutes the most ancient foundation of a court of equity, to wit, fraud. But for all that, courts of equity do not fail every day to exercise their ancient jurisdiction, and to decide when a cause falls within the meaning of that undefined and indefinable term. • So in cases of unprofessional conduct on the part of attorneys; whenever they so conduct themselves as to be unworthy of the trust and confidence which is involved in their official oath, and which the court has a right to repose in them as officers of the court, and in the honesty and integrity which should characterize them in the performance of their professional duties, then the court may remove them from their official position. Cases, not a few, go even further than this, and strike attorneys from the rolls for conduct not strictly within the confines of their professional duties, eases of which-it is not now necessary further to speak.
Our statute already quoted is doubtless declaratory of the common law so far as it goes; it may even be sufficiently comprehensive to embrace all cases, and certainly it is construed by section 611 of the same chapter to embrace not only crimes committed by an attorney, but the improper retention of a client’s money, and any malpractice, deceit or misdemeanor in his pro *317 fessional capacity. These terms are, indeed, very comprehensive and embrace within their scope an indefinite variety óf canses for striking an attorney’s name from the rolls. But the better doctrine as before stated we believe to be that a court which has the power to admit, has the inherent power, also, to remove one who has shown himself unfit longer to remain a member of an honorable and trusted profession.
The case at bar, however, is one too plain to require any nice inquiry as to whether it falls within the narrow domain of statutory definition or the broader one of inherent and common law power in this court, since it is plainly a case of deceit practiced on this court by members of this bar, and the fact that such deceit was not sucessful is owing to no fault of theirs; so far as in them lay, they misled and deceived, for a time, at least, this court. It is unnecessary that we go into any extensive discussion of the subject of the relations of attorneys toward the court of which they are members; their duties and obligations in their professional capacity; since this subject and the authorities pertinent thereto, have been so exhaustively discussed by Judge Gantt in his dissenting opinion in Mullins’ case (which is but a branch of this one), as to leave nothing to be desired. Being entirely satisfied with his views therein, we adopt them as our own and make them part of this opinion.
5. It is insisted for respondents that inasmuch as the falsified record of the bill of exceptions in Howell’s case, “imported absolute verity,” respondents “were bound to prepare their brief and malte their arguments with reference thereto only, regardless of the facts existing outside of the record.” But this argument, to give it such an appellation, is a mere evasion of the true issue which is, whether attorneys who have mtitilated and falsified the transcript of evidence designed for a bill of *318 exceptions, and thus deceiving the trial judge into signing the false bill, or who have connived at such falsification, and built their briefs and arguments upon it, can escape for this violation of their official obligation, on the ground of their own consmnmated fraud. If so, then malpractice and deceit are made very easy and punishment therefor very difficult; in fact, impossible, because all an attorney would have to do under this novel theory, would be to procure the false hill to he signed, then taking shelter beneath the aegis of its “absolute verity,” defy all known means of prosecution and punishment. If this anomalous theory were correct, then division number two of this court was certainly wrong, when, on affidavit, filed by the attorney general, it set aside the submission in Howell’s ease; made such orders and took such steps as restored the evidence as it originally was, thus striking down the hand of fraud and balking its nefarious machinations.
It is needless to discuss the subject further. The premises considered, we hold the evidence abundant, made up largely of his own admissions as a witness, that Harber is guilty in manner as aforesaid; that Knight, both on the evidence and on his own confession in open court, is guilty of all the charges preferred against him, save one heretofore mentioned.
In consequence of these findings, however much we may regret the unpleasant task allotted to us of striking from the rolls the names of two members of the bar, we can not allow the emotions of sympathy to interfere with the demands of stern and imperative duty, and therefore we are constrained to adjudge that, they and each of them, the said Harber and Knight have been guilty of such unprofessional conduct as to render them unfit longer to remain members of the bar of this court, and judgment will be entered accordingly, with costs.
Burgess, J., not sitting, Brace, C. J., *319 Gantt, Macfaelane and Robinson, JJ., concurring. Barclay, J., does not vote upon the merits, being in doubt as to the authority of this court in a case of this sort to enter the judgment announced.