BOYLE G. CLARK, GENERAL CHAIRMAN BAR COMMITTEES OF THE STATE OF MISSOURI ET AL., INFORMANTS, v. J. M. REARDEN, RESPONDENT.—104 S. W. (2d) 407.

Kansas City Court of Appeals.   April 5, 1937.

*Roy McKittrick*, Attorney General; *Franklin E. Reagan*, Assistant Attorney General; *Charles M. Howell, Jr.*, Assistant Attorney General, *James B. Burke* and *Paul M. Peterson* for informants.

*L. P. Embry* and *Harry H. Kay*, Members of Bar Committee, and *Roy W. Starling* of counsel.

*Victor Packman* for respondent.

*Harold Kaminsky* of counsel.

SPERRY, C.—This is a contempt proceeding, originated in this court by the filing of an information by the general chairman of Bar Committees of Missouri and his advisory committee. The information alleges that respondent, J. M. Reardon, a citizen of St. Louis, Missouri, not being a licensed attorney, unlawfully intruded himself into the office of attorney of this court and unlawfully engaged in the practice of law in Miller County, Missouri, which is within the territorial jurisdiction of this court; that he held himself one as an authorized attorney at law and did and performed certain specified acts upon two designated occasions, which said acts constituted the practice of law; and that the practice of law by an unlicensed person within our jurisdiction constitutes and is a contempt of this court.

Respondent was cited to file answer in this court and show cause why he should not be adjudged guilty of and punished for contempt.

Respondent filed answer, admitting the doing of the acts alleged. He denied that the doing of said acts constituted the practice of law; denied that he ever held himself out as an attorney at law; denied that the Kansas City Court of Appeals had the power to punish respondent in any event; and prayed dismissal of the information.

Upon suggestion of informants, a commissioner was duly appointed by this court to hear evidence and make report thereon. The commissioner heard evidence offered by both parties in Miller County, made findings of fact and conclusions of law thereon, and filed a complete transcript of the whole in this court, together with his recommendation that respondent be discharged. Informants filed exceptions to the report, findings and recommendations of the commissioner, and moved for judgment on the record. In such case we are not bound by the findings of fact or conclusions of law as reported by the commissioner. [State ex inf. Miller v. St. Louis Union Trust Co., a Corporation, 335 Mo. 845, 1. c. 858, 74 S. W. (2d) 348; In Matter of Richards, 333 Mo. 907, 1. c. 918, 63 S. W. (2d) 672.] However, the report of the commissioner is very thorough and conscientious, and it has been of great assistance to this court.

The facts disclosed by the record are as follows: Respondent was in the collecting business and had been so engaged for twenty years. He is not licensed as an attorney at law in this State or in any other jurisdiction. There is not sufficient evidence upon which to base a finding that he held himself out as an *attorney at law*, although his conduct was such as to permit the people with whom he dealt to assume that he was so licensed, and he did nothing to correct this, false impression they obtained. He was employed by Goddard Grocery Company to collect the sum of three checks which had been given it by the Brumley Farmers Exchange, a corporation, and which checks had not been paid by the bank. In December, 1935, he called on the manager of the Exchange and demanded payment. The amount claimed was paid, whereupon respondent wrote out and delivered to one of the directors an assignment of the claim, executing same in the name of Goddard Grocery Company by respondent as *attorney in fact*. He also advised the assignee of the legal effect of .the instrument of assignment and of his rights thereunder. On February 27 thereafter, he again called on the Exchange to collect an account against it in favor of Wulfing Grocery Company, which he represented. The Exchange was in financial difficulties and could not pay, but the manager invited him to come back later in an effort to settle the account. A few days later he returned, a meeting of the board of directors was called, and respondent met with them. He demanded payment, and informed them that suit would be brought if the account was not paid. The corporation could not pay, and he advised the board to make an assignment of

all the assets of the corporation for the benefit of its creditors. He advised the board of the legal effect of such an assignment and of the benefits that would accrue to the corporation. He brought with him a form of assignment, a quitclaim deed, and forms for minutes of the corporation authorizing and directing this action. The board of directors took his advice, used the forms of minutes which he prepared, and the president and secretary signed and executed the assignment for the benefit of creditors as prepared for them by respondent, conveying all personal property of the corporation to respondent in trust for the benefit of all creditors and providing therein that respondent be paid "a reasonable fee" for his services in executing the trust. He then prepared a quitclaim deed, which the president of the corporation signed and executed, conveying all of the real estate of the corporation to respondent absolutely and in fee simple, not as trustee but as unconditional grantee for consideration. It was then discovered that he had not obtained everything owned by the corporation, exclusive of its charter, but that a truck actually owned by the corporation, the legal title to which was vested in an individual, had been overlooked. He then advised the officers and board of directors as to the legal effect of a contract of employment involving the truck and of the rights of the corporation in regard thereto.

After having deeded and assigned all of the property owned by the corporation to a stranger representing a creditor, and solely upon his advice, the officers and board of directors of the corporation consulted licensed attorneys and sought to have respondent give the property back into their charge. This he refused to do unless he was paid $200 for his services. We are not informed of what his services consisted other than what we have mentioned herein.

The evidence does not show that any stipulated separate charge was made for the advise given or for the legal instruments drawn. The record does show, however, that respondent expected to be paid by Wulfing Grocery Company for services to it, and by the Farmers Exchange of Brumley for acting as trustee; and we think it immaterial that no separate charge was made for advice and preparation of legal papers. It is unnecessary to break a charge down into itemized sections in order to ascertain that a charge was made for each transaction; nor are we bound by a recital in the instrument of assignment, prepared by respondent, that his "fee" was to be for services as trustee. [State ex rel. Miller v. St. Louis Union Trust Co., 74 S. W. (2d) 348, l. c. 356.] There was a valuable consideration for the service rendered. It is not essential, in a contempt proceeding for illegally practicing law, to show that respondent was promised or paid any particular named amount in cash. The consideration, or the lack of consideration, and its nature, may

be important in some cases in determining whether the acts complained of constituted the practice of law, but it is not essential in all cases.

When respondent drew an assignment for the benefit of creditors ‎ a corporation, and advised the board of directors of its legal ‎ ⁀t, he was practicing law. [5 Am. Jur. 262, Section 3; Meunier v. ⁀ ⁀ ich, 170 So. 567, 1. c. 571; State ex inf. McKittrick v. C. S. ⁀ udⁱ ⁀ & Co., Mo. Supreme Court en banc, 102 S. W. (2d) 895; tatꞌ ꞌ rel. Boyle G. Clark et al. v. P. H. Coon, Mo. Supreme Court, 01 S ⁀. (2d) 977.] It avails nothing to say that some lawyer, v hose ⁀ ꞌe is undisclosed, had prepared and advised the use of a ꞌimilaꞌ ꞌorm or of the identical form, at some other time and place. Tⁱ ꞌ law is not static. It grows and changes from day to day, by legꞌ ꞌlative enactment and by judicial interpretation. What may be ꞌw today may not be the law tomorrow. Any one who wants to ꞌ ꞌy the price may purchase a set of form books and read and copy them. He may use them in his own business if he so desires. But when he advises others for a consideration, that this or that is the law, or that this form or that is the proper form to be used in a certain transaction, then he is doing all that a lawyer does when a client seeks his advice. The mere copying of the form is usually done in a lawyer's office by a stenographer; but the stenographer must be told by the lawyer what to copy, and the client relies upon the advice of the attorney as to whether the form will accomplish the desired result in his particular case. Nor will it do to say in this case that the forms used were the proper forms and were properly filled out; for that is not the test and is but begging the question. Indeed, the quitclaim deed in this case did not convey the property in trust for the benefit of creditors but conveyed the unrestricted title, which probably even *this* board of directors would not have done intentionally, and which they had no right to do. The body of the law is an intricate set of rules and regulations designed by society for the regulation of individuals and corporations in their relation with society and with each other. A knowledge of it can only be gained from a study of the common law, of the Constitution, of the statutes, and of the decisions of the courts, construed in the light of the particular facts and circumstances then before the court and the real objective sought to be attained thereby. It is a subject of too vital importance to be left to any but those who have prepared themselves by special study and have attained some standard of knowledge therein, as well as an ethical consciousness of their obligation to the public and to the client. This standard must be met under rules prescribed by public authority; and only after a license has been granted can one legally engage in the practice of law. Such restrictions are not primarily for the benefit of lawyers, but, rather, for the benefit of society. [People of the State of

New York v. Alfani, 227 N. Y. 334, l. c. 339; In re Opinion of Justices (Mass.), 194 N. E. 313.] One not licensed and who engages in the practice of law may be punished under Sections 11692 and 11693, Revised Statutes 1929, as for a crime.

But respondent is not being prosecuted under the statute and we are therefore not concerned with the legal effect of the statute, or with the difference, if any there be, between practicing law and conducting a law business as mentioned therein. We are only concerned with the statute in so far as it may restrict this particular action. The Legislature had a right to declare by statute what should constitute a crime and prescribe a penalty therefor, which is what the mentioned statute does. But the Legislature cannot restrict the ancient right of this court to declare what shall constitute a contempt of it. Both the Legislature and this court were established by the Constitution and the one may not infringe upon the powers of the other. Nor can any act of the Legislature, by laying down a definition of what shall constitute the practice of law, render this court impotent to punish for contempt one who is in fact guilty of contempt. It cannot do indirectly what it has no power to do directly. [Muenier v. Bernich, 170 So. 567, l. c. 575, 576; Rhode Island Bar Ass'n v. Automobile Service Ass'n, 179 Atl. 139, l. c. 142.] The right to determine what constitutes a contempt and to punish therefor is inherent in the court, since it "has, without any express grant, the inherent right to accomplish all objects naturally within the orbit of that department, not expressly limited by the fact of existence of a similar power elsewhere or the express limitations in the Constitution." [In Matter of Richards, 333 Mo. 907, l. c. 914; 1 Andrew's American Law (2 Ed.), Sec. 182, page 221.] Sections 11692 and 11693, Revised Statutes Missouri 1929, are in aid of the authority of the State to regulate the law practice and not a limitation thereon. It is an additional remedy and not an abridgement of preexiting remedies. [In Matter of Richards, supra; 5 Am. Jur. 262, Sec. 2; Meunier v. Bernich (La.), 170 So. 567, l. c. 574; Rhode Island Bar Assn. v. Automobile Service Assn., supra; State ex rel. Walker v. Harber et al., 129 Mo. 271, l. c. 294.] Nor is there any limitation in the Constitution. The right is necessary for the accomplishment of the purpose of the court, and has always been recognized and practiced. This is not an action between individiuals wherein rights of individual parties are to be determined; it is an action involving the public interest, and informants are literally informers and not parties in the ordinary sense. [See dissenting opinion in Depew et al. v. The Wichita Retail Credit Association, 141 Kan. 481, l. c. 488; In Matter of Richards, supra.] It does not have as its objective the issuance of an injunction but is a contempt proceeding, and if the information furnished to the court justifies a finding that respondent is guilty of contempt, informants cannot,

672

by any pleadings, even if they sought so to do, limit the nature of the punishment or direct the course of action to be taken by this court. Informants have merely laid the facts before us; we will determine if such facts constitute a contempt, and, in the event they do, what order to make to protect the court in future, and to punish the offender.

Respondent, an unlicensed person, practiced law within the territorial limits of this court's jurisdiction. The sole question here is: Does the practice of law outside the immediate presence of this court constitute a constructive contempt of this court? If it does, we have power to punish therefor.

If respondent had appeared in our court and practiced law, he would undoubtedly be in contempt for having practiced a fraud on the court, and for having performed a function of this court which can only be performed by an officer of this court. To hold otherwise would lead to the conclusion that he might with impunity presume to preserve order in the courtroom, a function to be performed by our marshal, or usurp a function of our clerk. Respondent agrees that for an unlicensed person to practice law in our court would be to commit a contempt for which we could punish. It is virtually conceded by respondent in oral argument that the Supreme Court has power to punish, by contempt proceedings, any unlicensed person who may presume to practice law in this State, whether the act occurs in its own forum or elsewhere, on the theory that the Supreme Court has sole authority to issue licenses to practice law. It has been held that the unlawful usurpation of a right solely within the province of the court to grant, constitutes a contempt of court. [Rhode Island Bar Assn. v. Automobile Service Assn., 179 Atl. 139, l. c. 141.] Our Supreme Court has held that it has power to punish by contempt proceedings in such cases. [State ex rel., Boyle G. Clark et al. v. P. H. Coon (Mo. Sup. Ct.), 101 S. W. (2d) 977.]

But it is said that, unless the offense actually occurs in court, or in connection with proceedings pending in court, no inferior court may take cognizance of it for the reason that it would make respondent liable in contempt proceedings not only to the Supreme Court but also to the Court of Appeals and to the Circuit Court of that jurisdiction. There is no logic in this contention for the reason that one who practices law without a license in or out of court, is in contempt of the Supreme Court. [State ex rel., Boyle G. Clark et al., v. P. H. Coon, *supra*.] If such a person should perfect an appeal from a Circuit Court to this court, he would surely be in contempt of the Circuit Court, as well as of the Supreme Court; and having prepared papers and pleadings to be filed in this court, which can only be prepared by an authorized attorney at law, he would be in contempt of this court. The right of this court to protect its own dignity cannot depend upon the contingency of the

liability of respondent to some other court, nor upon the fact that he may also be liable to prosecution under a criminal statute.

Next, it is urged that this court can exercise no control over even an attorney who is not, strictly speaking, an officer of this court, that is to say, one who has not actually signed the rolls of this court. Such a defense has never been recognized in cases of disbarment proceedings in this or any other Court of Appeals. And Courts of Appeal may entertain and adjudicate disbarment proceedings. [State ex rel. Ellroy v. Selleck et al., 252 Mo. 369; In re Sparrow, 90 S. W. (2d) 401, l. c. 402.] The inherent right of this court to entertain charges against an attorney is not based upon the fact that he is an officer of this particular court, that is, enrolled herein. It is based upon the necessity "for the protection of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good and the protection of clients." [Weeks on Attorneys at Law (2 Ed.), sec. 80, pp. 154, 155; In re Sparrow, *supra.*] The Sparrow case was one where the attorney was not enrolled in the Springfield Court of Appeals, where the cause originated, nor a citizen of that jurisdiction.

Subject to the superintending control of the Supreme Court, this court is vested with power to regulate and control the practice of law within this jurisdiction, to suspend, disbar, or otherwise punish licensed attorneys who practice their profession within the territorial limits of this court, whether in our immediate presence or whether or not in the presence of any court. We have superintending control over all inferior courts within this jurisdiction, which necessarily carries with it superintendence of the bar of these courts, for the bar is a part of the court. The practice of law can only legally be engaged in by those duly licensed therefor. If such practice by any attorney is unethical, even though no crime is committed, we may cite him before us and take such steps as may be deemed necessary in order to prevent its recurrence. This authority we exercise primarily not to punish for a wrong, but to protect the court from imposition, and the public from the evils of unethical practices by those unfit to be longer permitted to advise clients in regard to legal matters. This court has inherent powers to guard the administration of the law in its jurisdiction. That is the primary power. The regulation of attorneys is but secondary and supplemental. It is our duty to see that the law is administered by none except those deemed qualified, as evidenced by a license; and by them only as long as they remain ethically qualified. It would be illogical to say that we have the inherent power to revoke the license of, or to punish, one who was once deemed, by competent authority, to be fitted to advise the public in legal matters, and also to hold that such inherent authority does not extend far enough to protect the public and the reputation of the law, the courts, and the ministers

of the law and the courts, against one never considered qualified to advise in and practice the law. "To deny the power of the court to deal with such offenders would be tantamount to a destruction of the power itself." [The People ex rel. The Illinois State Bar Association et al. v. The Peoples Stock Yards State Bank, 344 Ill. 462, l. c. 473; State ex rel. Boyle G. Clark et al. v. P. H. Coon, supra.]

Our power is not circumscribed within the narrow limits urged by respondent, that is, the power to suspend and disbar attorneys. If it were, then we could not supervise and regulate the whole field of the administration and practice of the law, and could not accomplish the primary purpose for which courts were established. Such a ruling would place a limitation upon the power of the courts contrary to the very theory upon which our inherent power rests, as declared by all the courts since the beginning of our jurisprudence. We have the power, subject to the supervision of the Supreme Court, without statutory aid, to regulate and control the practice and administration of the law within this jurisdiction. This includes the power to prevent its unlawful administration or practice by any one not qualified, whether he be lawyer or layman. We necessarily have the power to enforce our authority, by contempt proceedings, if necessary.

We find that respondent was engaged in the unauthorized practice of law within this jurisdiction, and adjudge him in contempt of this court for so doing. It is further ordered that he appear before this court on the 3rd day of May, 1937, at nine-thirty o'clock A. M., to hear and obey such further orders and judgments as the court may render at that time. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. We find that respondent was engaged in the unauthorized practice of law within this jurisdiction, and adjudge him in contempt of this court for so doing. It is further ordered that he appear before this court on the 3rd day of May, 1937, at nine-thirty o'clock A. M., to hear and obey such further orders and judgments as the court may render at that time. All concur.