R. J. EDWARDS, INC., et al., Petitioners,

v.

R. L. HERT, District Judge, et al.,
Respondents.

MILBURN, COCHRAN & COMPANY, INC.,
et al., Petitioners,

v.

F. B. H. SPELLMAN, District Judge,
et al., Respondents.

STIFEL, NICOLAUS & COMPANY, INC.,
et al., Petitioners,

v.

Jack R. PARR, District Judge, et al.,
Respondents.

Nos. 40338, 42166 and 43254.

Supreme Court of Oklahoma.

Nov. 28, 1972.

**408**

Leon S. Hirsh, Paul Johanning, David Hudson, Hirsh, Johanning & Hudson, Okla-

homa City, for petitioners, R. J. Edwards, Inc., and others.

George J. Fagin, Oklahoma City, for petitioners, Milburn, Cochran & Co., Inc., and others.

Fenton R. Ramey, Yukon, for petitioners, Stifel, Nicolaus & Co., Inc., and others.

Paul M. Vassar, Gen. Counsel, Oklahoma Bar Association, Oklahoma City, James M. Springer, Jr., Stillwater, for respondents.

BARNES, Justice:

We shall refer to the parties by the characters in which they appeared in the courts of first instance, namely, as plaintiffs and as defendants.

These cases originated in the district courts of Payne, Major and Canadian Counties. Each was initiated by a petition against the respective defendants, municipal bond marketers and their agents, filed by the individual county bar associations, together with the Oklahoma Bar Association, to enjoin certain practices of the defendants, alleged to constitute the unlawful practice of law, by these defendants who were not members of the bar. The charges, in brief, were that the defendant corporations, who are engaged in negotiating for marketing, and also, themselves, in selling municipal bond issues and other types of securities, undertake, in that connection, to give legal advice to municipal authorities, to school boards, and to other representatives of entities who may be contemplating borrowing money through the issuance of bonds. It also is alleged that the corporate defendants, acting through their agents, the individual defendants, or through others, prepare resolutions, election proclamations, contracts, transcripts of bond proceedings and negotiable coupon bonds, all of which acts also are asserted to constitute the illegal practice of law by the defendants.

The defendants took the position that their acts did not amount to the practice of law in that they were merely assisting in filling out forms prescribed by the Attorney General according to his directions, and that, if this could be considered law prac-

tice, it was of the non-forensic variety, over which (it was asserted) the judicial branch of the government has no jurisdiction, on the theory that the Legislature alone may wield the police power in that regard. Subsidiarily, the defendants also raised the proposition that, in any event, the respective bar associations were without standing to maintain the actions, asserting that this Court has retained for itself exclusive jurisdiction in that regard.

Before these matters proceeded to hearing on the merits upon the issues raised in the district courts, the defendants filed with us applications for writs of prohibition to the respective district judges before whom the matters were pending, by which route defendants sought to achieve a prompt resolution, in their favor, of the contentions which they had urged in the district courts. We ordered the cases to be transferred here for hearing and determination. We shall resolve the several issues in accordance with the applicable legal principles.

Because of the importance of the issues raised to the due administration of justice and to the protection of the public welfare, we find it necessary to discuss at some length the principles that govern the relation of the legislative and the judicial departments of the government under the Constitution of this State.

Our Constitution provides:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others. Art. IV, § 1 (1907).

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; (reservation of initiative and referendum). Art. V, § 1 (1907).

"The authority of the Legislature shall extend to all rightful subjects of legisla-

tion, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever." Art. V, § 36 (1907).

As to the Judicial Department and its particular functions, the Constitution, Article VII, as adopted in 1907, read:

"The judicial power of this State shall be vested in the Senate, sitting as a court of impeachment, a Supreme Court, District Courts, County Courts, Courts of Justices of the Peace, Municipal Courts, and such other courts, commissions or boards, inferior to the Supreme Court, as may be established by law. § 1.

"The appellate jurisdiction of the Supreme Court shall be co-extensive with the State, and shall extend to all civil cases until a Criminal Court of Appeals with exclusive appellate jurisdiction in criminal cases shall be established by law. *The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs, as may be provided by law, and to hear and determine the same; and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law.* Each of the Justices shall have power to issue writs of habeas corpus to any part of the State upon petition by or on behalf of any person held in actual custody, and make such writs returnable before himself, or before the Supreme Court, or before any District Court, or Judge thereof, in the State. § 2. (Emphasis supplied)

"*The District Courts shall have original jurisdiction in all cases, civil and criminal, except where exclusive jurisdiction is by this Constitution, or by law, conferred on some other court,* and such

appellate jurisdiction as may be provided in this Constitution, or by law. *The District Courts, or any judge thereof, shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, prohibition, and other writs, remedial or otherwise, necessary or proper to carry into effect their orders, judgments, or decrees.* The District Courts shall also have the power of naturalization in accordance with the laws of the United States." § 10. (Emphasis supplied)

The new Article VII, adopted in 1967, in its corresponding parts, reads as follows:

"The judicial power of this State shall be vested in the Senate, sitting as a Court of Impeachment, a Supreme Court, the Court of Criminal Appeals, the Court on the Judiciary, the State Industrial Court, the Court of Bank Review, the Court of Tax Review, and such intermediate appellate courts as may be provided by statute, District Courts, and such Boards, Agencies and Commissions created by the Constitution or established by statute as exercise adjudicative authority or render decisions in individual proceedings. Provided that the Court of Criminal Appeals, the State Industrial Court, the Court of Bank Review and the Court of Tax Review and such Boards, Agencies and Commissions as have been established by statute shall continue in effect, subject to the power of the Legislature to change or abolish said Courts, Boards, Agencies, or Commissions. Municipal Courts in cities or incorporated towns shall continue in effect and shall be subject to creation, abolition or alteration by the Legislature by general laws, but shall be limited in jurisdiction to criminal and traffic proceedings arising out of infractions of the provisions of ordinances of cities and towns or of duly adopted regulations. authorized by such ordinances. § 1.

"The appellate jurisdiction of the Supreme Court shall be coextensive with the State and shall extend to all cases at law and in equity; except that the Court of Criminal Appeals shall have exclusive appellate jurisdiction in criminal cases until otherwise provided by statute and in the event there is any conflict as to jurisdiction, the Supreme Court shall determine which court has jurisdiction and such determination shall be final. The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law. The Supreme Court, Court of Criminal Appeals, in criminal matters and all other appellate courts shall have power to issue, hear and determine writs of habeas corpus,. mandamus, quo warranto, certiorari, prohibition and such other remedial writs as may be provided by law and may exercise such other and further jurisdiction as may be conferred by statute. Each of the Justices or Judges shall have power to issue writs of habeas corpus to any part of the State upon petition by or on behalf of any person held in actual custody and make such writs returnable before himself, or before the Supreme Court, other Appellate Courts, or before any District Court, or judge thereof in the State. The appellate and the original jurisdiction of the Supreme Court and all other appellate courts shall be invoked in the manner provided by law. § 4.

"The State shall be divided by the Legislature into judicial districts, each consisting of an entire county or of contiguous counties. There shall be one District Court for each judicial district, which shall have such number of District Judges, Associate District Judges and Special Judges as may be prescribed by statute. The District Court shall have unlimited original jurisdiction of all justiciable matters, except as otherwise provided in this Article, and such powers of review of administrative action as may be provided by statute. Existing electing districts for all who are or who become District Judges and Associate

District Judges under the terms of this Article shall remain as they are constituted for the offices formerly held by such persons on the effective date of this Article, until changed by statute. The Legislature may at any time delegate authority to the Supreme Court to designate by court rule the division of the State into districts and the number of judges." § 7(a).

We call attention to the fact that except for certain stylistic variations, Sections 1 and 4 of the new Article VII are identical in substance to Sections 1 and 2 of the former article, as to those provisions which are relevant to the problems before us, namely, the vesting of the judicial power in enumerated courts and other tribunals, and the original jurisdiction of this court and its authority to issue, hear and determine enumerated original writs. We note also that the legislative power to confer jurisdiction upon this court is limited by the adjectives "other and further", necessarily connoting that the legislative competence does not extend to trenching upon or limiting the authority of this court conferred upon it by the Constitution. We note that Section 7(a) of the new Article VII confers upon the District Courts "unlimited original jurisdiction of all justiciable matters", in this respect a more sweeping grant than the former bestowal of "original jurisdiction in all cases, civil and criminal except where exclusive jurisdiction is by this Constitution, or by law, conferred on some other court."

Based upon this comparison of the phraseology of these sections, we conclude that the authority of the judicial department in relation to the issues involved in this litigation certainly is no more restricted under the new Article VII than it was under the old Article VII. In some respects, this authority may be broader under the new article. Clearly, therefore, precedents which sustain the judicial department's jurisdiction under the former Article VII are equally significant in their application to its jurisdiction under the new Article.

Whenever the occasion has arisen, this Court has given effect to the provisions of the Constitution of this State vesting the full judicial power in the judicial department of government, and requiring the maintenance of the proper separation of powers between the three departments of government. This has been our position for over sixty years. Thus, in State Bar Commission ex rel. Williams .v. Sullivan' 35 Okl. 745, 131 P. 703, L.R.A.1915D, 1218 (1912), the respondent had attempted to hide behind a statutory privilege against discipline for false and scurrilous matter contained in a pleading. We refused the attempt on the ground that we had, "independent and aside from the statutory grounds of disbarment, the inherent power to suspend or disbar attorneys." Likewise, in State ex rel. Dabney v. Ledbetter, 127 Okl. 85, 260 P. 454 (1927), we relied on the proposition that, although, "in this state this proceeding is authorized by statute, . . . it is well settled that a court authorized to admit an attorney has inherent jurisdiction to suspend or disbar him for sufficient cause, and it is equally well settled that it not only has the power, but, whenever a proper case has been made out, it is its duty to exercise it." In the matter entitled In re Bozarth, 178 Okl. 427, 63 P.2d 726 (1937), we denied effect to an executive pardon as a means of thwarting our disbarment of a lawyer and judge who had been convicted of obtaining property under false pretenses. In that case, we said:

> "It may be conceded that the legislative branch of the government may make reasonable regulations governing the admission and disbarment of attorneys in aid of the court's powers but the ultimate power of admission or disbarment is inherently within the exercise of judicial discretion."

When the Legislature of this State, in 1939, determined that there no longer should be an integrated bar in Oklahoma, by repealing the act under which integration had been accomplished, a resolution was adopted by the Board of Governors of the Bar stating that "it is essential to the

best interest of the Bar and the public that the Bar of Oklahoma be integrated" and appointing a committee of lawyers to petition therefor. Such a petition was filed. See Integrated Bar by Court Order Suggested to the Supreme Court, 10 Okla.State Bar Jour. 235 (1939). This Court entered an order on June 29, 1939, establishing an Executive Council of the State Bar of Oklahoma and directing it to function as the governing body of the Bar, pending final action on the petition for integration. See In the Matter of the Integration of the Oklahoma State Bar Association, Bar Docket No. 415, 10 Okla.State Bar Jour. 303 (1939). Thereafter, October 10, 1939, some 43 days after the repealing act became effective, during which time the interim government for the Bar had been functioning, we entered our formal order, determining that the Oklahoma Bar should be integrated, under the name of the Oklahoma Bar Association. In re Integration of State Bar of Oklahoma, 185 Okl. 505, 95 P.2d 113 (1939). In that decision we reviewed the numerous authorities interpreting the provisions of American State Constitutions similar to ours. We held that, although there "is no express grant of power in the Constitution of Oklahoma giving to any of the three departments of government the right to define and regulate the practice of law, . . . the very fact that the Supreme Court was created by the Constitution gives it the right to regulate the matter of who shall be admitted to practice law before the Supreme Court and inferior courts, and also gives it the right to regulate and control the practice of law within its jurisdiction." We noted specifically that our Constitution, Art. 7, § 1, vested the judicial power in this and other enumerated tribunals. And as said in Petition of Florida State Bar Ass'n (Fla.), 40 So.2d 902, 905 and 907:

"Inherent power arises from the fact of the Court's creation or from the fact that it is a court. It is essential to its being and dignity and *does not require an express grant to confer it*. Under our form of government *it is the right that each department of government has to execute the powers falling naturally within its orbit when not expressly placed or limited by the existence of a similar power in one of the other departments*. In re Integration of Nebraska State Bar Association, 133 Neb. 283, 275 N.W. 265, 114 A.L.R. 151.

\* \* \* \* \* \*

"Attorneys are not, under the law, State or County Officers, but they are officers of the Court and as such constitute an important part of the judicial system. As we said in the case of In re Integration of Nebraska State Bar Association, supra, *the law practice is so intimately connected with the exercise of judicial power in the administration of justice that the right to define and regulate the practice naturally and logically belongs to the judicial department of the government*. In Laughlin v. Clephane, et al., 77 F.Supp. 103, the United States District Court for the District of Columbia reviewed another phase of the Court's power to admit attorneys and impose fees and there held that the admission and disbarment of attorneys was a judicial and not a legislative act, that apart from any statutory law, *a court of record has the inherent power to provide the necessary assistance as a means of conducting its business*.

\* \* \* \* \* \*

"The last cited case also approves the theory that while the legislature may impose minimum standards for admissions and regulation of the bar, the courts have inherent power to impose additional requirements." (Emphasis supplied)

And, as said in Gardner v. Conway, 234 Minn. 468, 48 N.W.2d 788 (1951):

"Any criterion for distinguishing law practice from that which belongs to other fields can be properly geared to the public welfare only if we keep in mind the manner in which the licensing of lawyers serves its purpose. The law practice franchise or privilege is based upon the threefold requirements of *ability*,

*character,* and *responsible supervision.* The public welfare is safeguarded not merely by limiting law practice · to individuals who are possessed of the requisite ability and character, but also by the further requirement that such practitioners shall thenceforth be officers of the court and subject to its supervision." (Emphasis supplied)

It clearly appears from our course that we vindicated the constitutional authority of this Court to integrate the bar of this State and otherwise to regulate and control the practice of law. This position was made clearer when, shortly after, the proceeding entitled In re Bledsoe, 186 Okl. 264, 97 P.2d 556 (1939), came before us. We there held invalid Section 4 of the Act of 1939, repealing the State Bar Act, which section expressly undertook to give effect to an asserted legislative control over the bar and admissions thereto (Sections 1, 2), by enacting that the graduates of certain enumerated categories of law schools should be entitled to admission to the bar without examination. Article 9 of the order establishing the Oklahoma Bar Association, cited supra, established a Board of Bar Examiners, gave it authority over admissions to the bar, and the making of rules governing admissions, subject to the approval of the Supreme Court. The board's rules made no provision for the admission of the graduate of any law school without examination. We expressly ruled that the legislative act was "in excess of legislative power." We said:

"There is no provision of the Constitution which specifically fixes the authority for determining the qualifications for admission to the Bar in either the legislative or the judicial branch of the government. The only applicable provision of the Constitution is section 1, article 4, Okl.St.Ann., which is as follows: 'The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and dis-

tinct, and neither shall exercise the powers properly belonging to either of the others.'

"It appears that a constitutional provision similar to our own relating to the division of powers is found in the Constitutions of most of the states and said provisions have been before the courts on numerous occasions in connection with the problem here presented. The Legislature is not without authority to prescribe qualifications for admission to the practice of law. Neither is such authority without limitation."

We then quoted at some length from the then recent Opinion of the Justices, 279 Mass. 607, 180 N.E. 725, 81 A.L.R. 1059 (1935), as representative of the weight of authority, and continued:

"An example of a proper exercise of the legislative power in this regard is the State Bar Act, Chapter 264, Session Laws 1929, 5 Okl.St.Ann. § 21 et seq. which was a comprehensive Act creating a State Bar and prescribing the duties and functions thereof. It is noted that the offices and duties designated by that Act were merely to aid the court in the matter of admissions to the Board and in the imposition of disciplinary measures. The Act did not purport to invade the province of the Court in exercising the ultimate right to determine the qualifications of those who should be admitted to the practice of law. The constitutionality of that Act was upheld in the case of State Bar of Oklahoma v. McGhee, 148 Okl. 219, 298 P. 580."

We had said, in the McGhee case, that it was "not necessary to decide as to whether or not, under the implied power of this court, . . . it can prescribe rules and regulations that would be different from those prescribed by the Legislative branch of the government" since the Legislature, by the Bar Act, "was merely aiding this court in its efforts to secure purity in the practice of those who appear before it."

In Ford v. Board of Tax-Roll Corrections of Oklahoma County, 431 P.2d 423 (Okla.

1967), in the course of determining that the Oklahoma Bar Association is a duly created state agency and instrumentality, the property of which is exempt from taxation under Art. X, § 6, Okla.Const.1907, we reviewed and re-examined our prior decisions, both before and after the repeal of legislative provisions relative to the regulation and discipline of the bar. We cited decisions of other states having constitutional provisions similar to ours which recognized that these provisions placed in the judicial department the regulatory police or governmental power of the state in respect to the practice of the law, a power which predominates over legislative authority in the same field in the event of conflicting prescriptions, and we accepted those decisions as relevant authorities for the construction of our own Constitution. We summarized the basis for our decision thus:

"It is our conclusion that, this Court's action in integrating the State Bar was an exercise of the police power vested in this court; that the dues or fees paid by the members into the treasury of the Association are for a public purpose connected with the administration of justice; and that when the Association was created by the Supreme Court this constituted creation by State action of a State agency to serve a public purpose. It is our further conclusion that the subject property is owned and used by the Association under the supervision and control of the Supreme Court for public purposes connected with the administration of justice, for the sole use and benefit of the State of Oklahoma."

It is evident, therefore, that, so far from conceding, in any way, authority to the Legislature to hinder our effective control over the practice of the law, we have consistently asserted and exercised that control. Indeed, in Section 26 of the State Bar Act (Okla.Stat.1931, § 4235), the Legislature recognized our primacy in the field by stating that the powers conferred by the Act on the Board of Governors were "in addition to the powers to disbar or discipline members of the bar as now held and exer-

cised by the Courts." The only such powers provided after the enactment of the State Bar Act were those arising under the Constitution.

Moreover, our position did not confine our exercise of powers to the conduct of lawyers or of others, either inside the courtroom or in direct connection with "forensic" matters. In Crawford v. McConnell, 173 Okl. 520, 49 P.2d 551 (1935), we held void and unenforcible a layman's contract described in the following terms:

"In the case at bar, the plaintiff bound himself by the terms of the contracts entered into with the various taxpayers to determine and decide for them the legality of the various tax levies made against their property. There are few questions in law that are more difficult than the determination of what constitutes a legal tax. A large number of cases are contained in the reported decisions of this court in which the only questions involved were those relating to the legality of tax levies by the various municipalities of this state. Yet the plaintiff by the terms of his contract proposes to determine these intricate questions for and on behalf of the taxpayers with whom he has made contracts and to prepare for such taxpayers protest notices, and for this service he expects to receive a compensation in the form of a stipulated contingent commission. Clearly we think this service should only be rendered to the public by one who has demonstrated his qualifications to advise on such matters in the manner required by law.

\*   \*   \*   \*   \*   \*

". . . Clearly, we think the plaintiff by his contract undertook to perform a type of service which could only properly be performed by one who had demonstrated his qualifications by obtaining a license to practice law."

We further indicated in that opinion our disavowal of the propriety of contracts entered into by members of the bar, obtaining an interest in the tax claims in question, and undertaking to perform the legal services for which the plaintiff had contracted.

In State Bar of Oklahoma v. Retail Credit Assoc., 170 Okl. 246, 37 P.2d 954 (1934), we held that a demurrer should not have been sustained against a portion of a petition which the opinion summarized briefly as follows:

"In this action the plaintiff seeks to enjoin certain acts, dealings, and conduct of the defendants, on the theory that in some instances they constitute the unauthorized practice of law; that they include a repeated and systematic holding out of the defendants as authorized to give legal advice and render legal services when defendants are wholly without such authority, and upon the theory that these, and additional acts of the defendants, constitute a fraud on the defendants' customers, and a fraud on the people and the public, and that such fraud is perpetrated in the name of certain legal and judicial phrases and by the use of pretended legal and judicial forms, and in pretense of familiarity with, and the right to use, the courts of Oklahoma in coercing and forcing the payment of money. And the plaintiff avers that such acts and conduct of defendants customarily and regularly engaged in tend to bring into disrepute the law, the judiciary, the practice of law, and the administration of justice, by inferring that all are subservient to defendants in making good their threats against debtors. And plaintiff contends that such acts and conduct of the defendants tend to seriously hinder the administration of justice by reason of the promotion of ill repute thereof as aforesaid."

In re Hicks, 163 Okl. 29, 20 P.2d 896 (1933), was a decision which disbarred a lawyer for his decidedly non-forensic misconduct of seducing a dwarf having the intellect of a child. We held that a lawyer must maintain a sound moral character, after as well as before admission to the bar.

It is clear, then, that, under the Constitution as it existed prior to July 11, 1967, the Judicial Department was vested with full and complete authority, independent of the Legislative Department, to control and regulate the practice of law in all its forms, and to prevent the intrusion of unlicensed persons into the practice, without regard to whether the acts involved were "forensic" or "nonforensic". We see nothing in the constitutional changes which took place on that day to derogate from that authority. Article IV, Section 1, of the Constitution, which, by virtue of its provisions on the separation of powers, forbids the Legislative Department to trench upon the powers properly belonging to the Judicial Department, remains unchanged. The provisions of the new Article VII, which already we have set forth, are as strong, and in some respects stronger, in regard to judicial authority over the practice of law, than the provisions which they supersede. Accordingly, we are constrained to deny the contentions of the defendants that the Judicial Department lacks authority, without legislative sanction, to inquire into their action to determine whether it constitutes illegal practice of law. Obviously, we also deny the contention that so-called non-forensic acts do not amount to the practice of law. So far as anything said in In re Saddler, 35 Okl. 510, 130 P. 906 (1913), may appear to conflict with these principles, it is overruled.

Embedded in the defendants' briefs is the contention that the term "practice of law" is ambiguous and uncertain, and that we should define it with specificity before persons should be held to answer for derelictions in respect thereto. We pass by the obvious fact that statutes and judicial decisions, to which we have adverted, have employed "practice of law" with the apparent acquiescence of everyone that persons know what is meant thereby. We call attention to our statement in Crawford v. McConnell, supra:

"The preparation for a money consideration of legal instruments to be shaped from a mass of facts and conditions involving the application of intricate principles of law which can only be applied by a mind trained in existing laws in order to insure a specific result and to guard

against other undesirable results comes within the term 'practice of law.' "

We note further that, in Latson v. Eaton, 341 P.2d 247 (Okl.1959), the defendant, not licensed to practice law, had prepared legal instruments for the plaintiff, described in the official syllabus as "promissory notes, deeds and mortgages", and that, citing State Bar of Oklahoma v. Retail Credit Assoc., supra, Conway-Bogue Realty Inv. Co. v. Denver Bar Assoc., 135 Colo. 398, 312 P.2d 998, and Paul v. Stanley, 168 Wash. 371, 12 P.2d 401 (1932), we stated that he had practiced as a lawyer would practice and was responsible to his "clients" for loss caused by his deficiencies.

■ Our decisions definitely spell out the concept of the practice of law: the rendition of services requiring the knowledge and the application of legal principles and technique to serve the interests of another with his consent. This is a concept applied over and over again in other jurisdictions. State Bar of Arizona v. Arizona Land Title & Trust Co., 90 Ariz. 76, 366 P.2d 1 (1961); Beach Abstract & Guaranty Co. v. Bar Assoc. of Arkansas, 230 Ark. 494, 326 S.W.2d 910 (1930); Arkansas Bar Assoc. v. Union Nat. Bank, 224 Ark. 48, 273 S.W.2d 408 (1954); Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16, 65 A.L.R.2d 1358 (1958); Title Guar. & Trust Co. v. Denver Bar Assoc., 135 Colo. 423, 312 P.2d 1011 (1937); People ex rel. Illinois State Bar Assoc. v. People's Stock Yards State Bank, 344 Ill. 462, 176 N.E. 901 (1931); People ex rel. Chicago Bar Assoc. v. Tinkoff, 399 Ill. 282, 77 N.E.2d 693 (1948); State ex rel. Boynton v. Perkins, 138 Kan. 899, 28 P.2d 765 (1934); Depew v. Wichita Assoc. of Credit Men, Inc., 142 Kan. 403, 49 P.2d 1041 (1935); Frazee v. Citizens Fidelity Bank & Trust Co., 393 S.W.2d 788 (Ky.1965); Fritchette v. Taylor, 191 Minn. 582, 254 N.W. 510, 94 A.L.R. 356; Liberty Mut. Ins. Co. v. Jones, 344 Mo. 932, 130 S.W.2d 945 (1919); Hulse v. Criger, 363 Mo. 26, 247 S.W.2d 855 (Mo.1952); Hoffmeister v. Tod, 349 S.W.2d 5 (Mo.1961); State ex rel. Johnson v. Childe, 147 Neb. 527, 23 N.W.2d 720 (1940); People v. Alfani, 227 N.Y. 234,

125 N.E. 671 (1919); People v. Lawyers Title Corp., 282 N.Y. 513, 27 N.E.2d 30 (1940); Judd v. City Trust & Savings Bank, 133 Ohio St. 81, 12 N.E.2d 288 (1937); Oregon State Bar v. John H. Miller & Co., 235 Ore. 341, 385 P.2d 181 (1965); In re Morse, 98 Vt. 85, 126 A. 550 (1924); Washington State Bar Assoc. v. Washington Assoc. of Realtors, 41 Wash.2d 697, 251 P.2d 619 (1953); State ex rel. Reynolds v. Dinger, 14 Wis.2d 193, 109 N.W.2d 685. In view of our own prior statements, and of this long line of like statements elsewhere, it was unnecessary that we should otherwise have defined "practice of law" to include specific acts as a prerequisite to the exercise of the proper jurisdiction of the judicial department. There is authority elsewhere which so holds, Richmond Assoc. of Credit Men, Inc. v. Bar Assoc. of City of Richmond, 167 Va. 327, 189 S.E. 153 (1937); Washington State Bar Assoc. v. Washington Assoc. of Realtors, supra. We consider that authority persuasive and we follow it.

This is not to say that there may not be problems in respect to particular facts, or to the sound discretion which is ours in policing the practice of law. With some of these we shall deal later. But certainly it is unnecessary that we should attempt to anticipate every such problem and to write a detailed code describing every possible situation before the courts may exercise their unquestionable authority.

■ To avoid any misunderstanding which might be created by our reference in Crawford v. McConnell, supra, to the plaintiff's expectation of compensation for his services, we emphasize that a service which otherwise would be a form of the practice of law does not lose that character merely because it is rendered gratuitously. We said in Pyeatt v. Estus, 72 Okl. 160, 179 P. 42, 4 A.L.R. 1570 (1919), that it "is not a prerequisite that a fee should be paid before the relation of attorney and client may exist", citing Packard v. Delfel, 9 Wash. 562, 38 P. 208 (1894), which sustains this proposition. That an unlicensed practitioner's performance of legal service is not sanctified by his failure to require pay is sup-

ported by State ex rel. Wright v. Barlow, 131 Neb. 294, 268 N.W. 95 (1936); In re Baker, 8 N.J. 321, 85 A.2d 505 (1951); see People ex rel. Atty. Gen. v. Jersin, 101 Colo. 406, 74 P.2d 668 (1937); Clark v. Reardon, 231 Mo.App. 666, 104 S.W.2d 407 (1937); Darby v. Mississippi State Board of Bar Admissions, 185 So.2d 684 (Miss.1966); compare Niklaus v. Abel Constr. Co., 164 Neb. 842, 83 N.W.2d 904 (1957).

It has been urged upon us that acts which properly are part of the lawyer's work also may form an integral part of the legitimate activity of another calling, and that, for performance of these acts by an unlicensed person, incidental to such an independent vocation, penalties should not be inflicted upon the theory that thereby he practices law. To a certain extent, this contention is sound. "There is authority for the proposition that the drafting of documents, when merely incidental to the work of a distinct occupation, is not the practice of law, although the documents have legal consequences." Lowell Bar Assoc. v. Loeb, 315 Mass. 176, 52 N.E.2d 27 (1943). The above opinion then goes on to cite a mass of supporting authorities for the proposition, and to expound some well chosen examples of the activities which legitimately may be performed as "incidental to the performance of other service of a nonlegal character in the pursuit of another calling", as was said in Gardner v. Conway, supra. Here, says the court in Lowell Bar Assoc. v. Loeb, supra, "we enter debatable ground." There is need to develop information as to the fact situation before coming to judgment. Creditors Service Corp. v. Cummings, 57 R.I. 291, 190 A. 2. The "distinction between law practice and that which is not may be determined only from a consideration of the acts of service performed in each case." Gardner v. Conway, supra. However, upon one basic principle there is substantial agreement. If the practitioner of the "distinct occupation" goes beyond the determination of legal questions for the purpose of performing his special service, and, instead, advises his patron as to the course to be taken to secure a desired legal status, he is engaged in the practice of law. The title searcher is exempt if he performs his task "without giving opinion or advice as to the legal effect of what is found." In re Opinion of the Justices, 289 Mass. 607, 194 N.E. 313, 318. The work of the accountant is exempt only if it is "dissociated from legal advice." Id. One who, in the exercise of a commission to draw a conveyance, selects language designed to create a certain effect is practicing law. State Bar of Arizona v. Arizona Land Title & Trust Co., supra; In re Matthews, 57 Idaho 75, 62 P.2d 578, 111 A.L.R. 13 (1936); Washington State Bar Assoc. v. Washington Assoc. of Realtors, supra. So is one who draws estate plans, involving legal analysis. Frazee v. Citizens Fidelity Bank & Trust Co., supra; Oregon State Bar v. John H. Miller & Co., supra. A layman who draws a will for another necessarily is practicing law. People ex rel. Illinois State Bar Assoc. v. People's Stock Yards State Bank, 344 Ill. 462, 176 N.E. 901; In re Baker, supra. So is one who draws legal instruments or contracts. People v. Alfani, supra. A layman who evaluates a claim, and undertakes to settle it, based upon applicable legal principles, is practicing law. Liberty Mut. Ins. Co. v. Jones, supra. A bank which furnishes "legal information or legal advice with respect to investments, taxation, stocks, bonds, notes or other securities or property" is involved in "a considerable practice of law", despite the argument that this is an incident to the investment trade. In re Opinion of the Justices, supra; compare State Bar Assoc. of Connecticut v. Connecticut Bank & Trust Co., 145 Conn. 222, 140 A.2d 863.

In none of these and in none of the myriad other situations which may arise is the impropriety of the practice avoided by the fact that the services are rendered by a lawyer who is in the employ of the unlicensed layman. This is the clear import of our reasoning in Crawford v. McConnell, supra, and it is supported by soundly reasoned decisions elsewhere. State ex rel. Boynton v. Perkins, 138 Kan. 899, 28 P.2d 765.

Based upon these principles, we approach the problems raised by the record before us. After the causes were brought here, the parties entered into a stipulation as to each case, which established the following salient facts:

(1) That each of the respective corporate defendants, prior to the filing of the suit in District Court, performed all proceedings relating to the particular bond issue handled by it, including preparation of required statistical data, and that thereafter the proceedings were prepared either by the officials of the issuing governmental entity under the supervision of attorneys certified by defendants to the entity, along with others, as "market attorneys", a classification of attorneys whose favorable opinion would be required by the purchasers of bonds, or were prepared directly by said attorneys and that said attorneys were employed by the governmental entities to complete the proceedings because they feared the possible adverse effect of the District Court suit upon the validity of the bonds;

(2) That the respective corporate defendants would have conducted all said proceedings had not the District Court actions been filed;

(3) That among necessary parts of proceedings for bond elections and the issuance and sale of bonds are (a) enactment of a resolution, in form and in compliance with directions given in a manual prepared by the Attorney General of Oklahoma as ex officio Bond Commissioner; (b) in connection with such bond election a statement of "purpose" in accordance with directions given in said manual; (c) election proclamation and notice of election and publication thereof in accordance with directions in said manual;

(4) That Oklahoma bond issues and the proceedings therefor must be submitted to the Attorney General as Bond Commissioner for approval and that he requires such proceedings shall be in form provided by the manual aforesaid, with blanks filled in substantial compliance with the manual,

which forms are not available from the Attorney General nor for purchase, but that the corporate defendants have caused complying blank forms to be printed at their own expense and furnished to the governmental entities employing such defendants as financial consultants;

(5) That each corporate defendant's employment by the respective governmental entity was procured as the result of solicitation, in competition with other bond firms, as a result of news items announcing consideration of issuance of the bonds, without prior connection of the corporate defendants or any of the agents or employees, or of the bond attorneys, with the officials of the governmental entity;

(6) That the officials of the respective governmental entities lack working knowledge of the laws relating to bond issues, but could have obtained a copy of the Attorney General's manual aforesaid and, by following the directions, could have produced an acceptable transcript of the bond proceedings;

(7) That a failure to follow the manual directions and the prescribed forms would result in a refusal of approval by the Bond Commissioner, which then could have been sought only by mandamus, as there are no statutory validation proceedings; and that the contract between the corporate defendants and the governmental agencies does not include institution of, or participation in, any such mandamus proceedings.

We understand these stipulations establish, for the purposes of this proceeding, that the defendants merely reproduced forms prepared by the Attorney General, furnished them to the school districts, and filled them out according to the directions set out in the Attorney General's handbook. Title 62 O.S.1961, §§ 11 and 13, provides:

"§ 11. Bond Commissioner.—The Attorney General is hereby made ex officio Bond Commissioner of the State of Oklahoma.

"§ 13. Duties of Bond Commissioner. —Certificate—Bonds incontestable after 30 days.—It shall be the duty of the Bond

Commissioner to prepare uniform forms and prescribe a method of procedure under the laws of the State in all cases where it is desired to issue public securities or bonds, in any county, township, municipality or political or other subdivisions thereof of the State of Oklahoma; and it shall be the further duty of said Bond Commissioner to examine into and pass upon any security so issued, and such security, when declared by the certificate of said Bond Commissioner to be issued in accordance with the forms of procedure so provided shall be incontestable in any court in the State of Oklahoma unless suit thereon shall be brought in a court having jurisdiction of the same within thirty days from the date of the approval thereof by the Bond Commissioner."

Thus, the Attorney General is by statute charged with the duty of preparing uniform forms, prescribing procedure, examining and passing upon the validity of securities so issued. In practical effect, the Attorney General is made the attorney for these subdivisions which desire to issue public securities or bonds.

■ To the extent that the defendants merely filled in the uniform forms prescribed by the Attorney General, they apparently acted as an amanuensis, secretary, or clerk for that attorney. The record before us does not show that this called for the determination of questions involving legal skill, or constituted the practice of law.

■ It will be necessary for cases in the future to fully develop the facts in order to determine if the conduct of a particular business constitutes an enjoinable practice of law. Note, for instance, the detailed specificity employed in State Bar of Arizona v. Arizona Land Title & Trust Co., supra; Oregon State Bar v. John H. Miller & Co., supra; Frazee v. Citizens Fidelity Bank & Trust Co., supra; Liberty Mut. Ins. Co. v. Jones, supra. In addition, a court, in policing the practice of law, is entitled to exercise a sound discretion in tempering its decrees (People ex rel. Illinois State Bar

Assoc. v. People's Stock Yards State Bank, supra; Depew v. Wichita Assoc. of Credit Men, Inc., supra; State ex rel. Johnson v. Childe, supra; People v. Alfani, supra), or in permitting, as a matter of policy or of public convenience, certain types of legal practice by unlicensed persons. Conway-Bogue Realty Inv. Co. v. Denver Bar Assoc., supra; Cowern v. Nelson, 207 Minn. 642, 290 N.W. 795 (1941); State v. Dinger, supra; compare People v. Title Guar. & Trust Co., 227 N.Y. 366, 125 N.E. 666 (1919). We cite these decisions, not to indicate that the decrees to be entered in future cases should approximate any one of them, but to illustrate the need for development of facts. We feel that the efficiency of this Court and of its staff will be promoted if, in most instances, the development of all relevant information is left with the tribunals of first instance in which the proceedings are instituted, and we would so conclude, without further comment, but for the fact that the defendants have raised the contention that this Court alone has jurisdiction to entertain proceedings of this character. Accordingly, we now turn to the solution of that issue.

■ The preceding discussion and the constitutional provisions upon which it is founded make it clear that this Court does have original jurisdiction to entertain complaints alleging unlawful practice of the law by unlicensed persons. Is this jurisdiction exclusive of a like authority in other courts of the State? We note that the judicial power, the source of authority over admission to the bar and to the regulation of the practice of law is not vested in this Court exclusively, but in a series of named courts, including the district court (Art. VII, § 1, 1967). We note further that the district courts are to "have unlimited original jurisdiction of *all justiciable matters,* except as otherwise provided in this Article." There is no such provision "otherwise" with respect to the control over unauthorized practice of the law. That controversies respecting alleged unauthorized practice are "justiciable matters" is made clear by the authorities to which we have

already adverted. Clearly, then, the unlimited original jurisdiction of all justiciable matters vested in the district court includes controversies such as those involved in these proceedings. We have no hesitance, therefore, in directing that future cases be filed in the district courts where the facts can be fully developed.

One other matter requires attention, briefly. The defendants have challenged the standing of the bar associations to maintain these actions. In each of the three, the plaintiffs were the Oklahoma Bar Associa- and the County Bar Association of the county in which the action was filed. In each, the plaintiffs' petitions alleged that they and the public will suffer irreparable damage unless the defendants are enjoined from engaging in the unauthorized practice of law.

In State v. Sperry (Fla.), 140 So.2d 587, 595, it was said:

"The reason for prohibiting the practice of law by those who have not been examined and found qualified to practice is frequently misunderstood. It is not done to aid or protect the members of the legal profession either in creating or maintaining a monopoly or closed shop. It is done to protect the public from being advised and represented in legal matters by unqualified persons over whom the judicial department can exercise little, if any, control in the matter of infractions of the code of conduct which, in the public interest, lawyers are bound to observe.

"It cannot be denied that the public suffers, as does both the public image of the legal profession and our judicial system, when those not qualified to do so are permitted to hold themselves out as qualified to practice law and as worthy of the trust and confidence of those who have legal problems the solution of which require trained advice and counsel.

"If the truth be known the unauthorized practice of law by those not qualified and admitted actually creates work for the legal profession because of the errors and mistakes of those who for others illegally perform legal work they are not competent to perform. In this the members of the legal profession gain, but the unfortunate members of the public who were ill-advised lose, in some instances quite badly.

"It is the effort to reduce this loss by the members of the public that primarily justifies the control of admissions to the practice of law, discipline of those who are admitted, and the prohibition of the practice to those who have not proved their qualifications and been admitted. As incidents of this system the administration of justice is aided and the public image of the legal profession is enhanced."

As shown by the preamble to the Rules Creating and Controlling the Oklahoma Bar Association (Title 5, Ch. 1, App. 1, O.S.1971 and 1961), said Association was created:

"In the public interest for the advancement of the administration of justice according to law, and to aid the courts in carrying on the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, learning, competence, and public service, and high standards of conduct;

\*  \*  \*  \*  \*  \*

" . . . to encourage practices that will advance and improve the honor and dignity of the legal profession; and to the end that the responsibility of the legal profession and the individual members thereof, may be more effectively and efficiently discharged in the public interest, and acting within the police powers vested in it by the Constitution of this State \* \* \*."

The Oklahoma Bar Association is unique among other associations of attorneys in this State in that it is the only one this Court, in the exercise of the power herein discussed, has created to protect the public against the unauthorized practice of law, and it is the one organized bar association that is in a position to speak and act in such matters throughout the State, generally.

■ We recognize that strong arguments have been made for affording individual attorneys and local or county bar associations the right to be heard in an action like the present one, as evidenced by the cases cited and discussed in the annotation at 90 A.L.R.2d 7, 64–77, both inclusive, and the footnotes to 7 Am.Jur.2d, "Attorneys at Law", § 89. However, in the present cases the plaintiffs' petitions made no distinction between the injury they, or either of them, would suffer from the defendants' alleged unauthorized practice and the injury the public might suffer. (Plaintiffs' petitions merely alleged that they *and the public* will suffer irreparable damage unless defendants are enjoined from engaging in the unauthorized practice of law.) Consequently, in view of what is herein indicated concerning this Court's delegation of duties to the Oklahoma Bar Association as its "arm", in the regulation of the practice of law in this State and of the "confusion, if not chaos" that might result "from independent proceedings of this sort" by individual lawyears and local and/or county bar associations of this State (see Dade-Commonwealth Title Ins. Co. v. North Dade Bar Ass'n., Fla., 152 So.2d 723), we hold that the Oklahoma Bar Association is the only proper party to bring an action of this character. Accordingly, it is our opinion that the trial court, in the Payne County case, erred in not sustaining, as to the County Bar Association that appeared as a plaintiff in that action, the defendants' challenge to the plaintiffs' capacities to sue therein.

As it is our opinion that no cause of action has been shown therefor, the injunctive relief that plaintiffs sought against the defendants in the three actions here involved is denied and the respondent judges are prohibited from proceeding further therein.

BERRY, C. J., and WILLIAMS, HODGES, LAVENDER and SIMMS, JJ., concur.

DAVISON, V. C. J., and IRWIN, J., concur in result.

JACKSON, J., concurs in part, dissents in part.

JACKSON, Justice (concurring in part and dissenting in part).

I concur in the view that injunctive relief should be denied and that prohibition should be granted.

I am of the opinion that the Legislature did not intend to leave a vacuum when it repealed its Integrated Bar Act in 1939 for unlicensed practitioners, but I do not believe we should assume the duty of writing law to control all those unlicensed businesses and occupations such as title companies, real estate brokers, automobile clubs, collection agencies, tax counsel, adjusters, banks and trust companies, accountants, architects, and bond merchants, whose activities are primarily unrelated to the administration of justice. I do agree that this court may lawfully suppress the preparation of pleadings and wills and other documents by unlicensed practitioners that are destined for consideration in the courts. I also agree that this court may direct the Oklahoma Bar Association to initiate injunctive procedures to prevent disbarred and suspended lawyers from engaging in the practice of law, since a contrary holding would be in conflict with this court's power to suspend and disbar. I would not authorize the Oklahoma Bar Association to file any action in a district court for the suppression of an unlicensed practitioner without the prior approval of this court.

I am well aware that most other states have held that the courts may prohibit the practice of law by unlicensed practitioners. Some have done so by statutory authorization: Connecticut by Title 51, Secs. 87 and 88; Hawaii by Rev.Sts., Vol. 7, Sec. 605–14, in pocket part, page 37, Georgia, Code of Georgia 9–402, pages 98 and 99, and 9–407 in pocket part, page 58; Illinois, Ill.Sts., Title 13, Sec. 1; Alabama, Title 46, Sec. 42; Alaska, Alaska Sts., Business and Professions, Sec. 08.08.230; Arkansas, Ark. Sts., Legal Admissions and Unauthorized Practice, Secs. 25–205—25–217; Arizona, Professions and Occupations, Title 32, Sec.

261; California, Cal.Sts., Article 7, Secs. 6125, 6126, and 6127; Idaho, Idaho Sts., Attorneys and Counselors at Law, 3–418—3–104; Indiana, Burns Ind.Sts., Attorneys, 4–7401; Kentucky, Ky.Rev.Sts.1971, Sec. 30.010, page 467; and Maine, Maine Rev. Sts.Ann., Vol. 2, Sec. 4–807, pages 263 and 264. Other courts have held that a license to practice law is in the nature of a franchise, a property right, and entitled to protection from competition by an unlicensed person. See Anno. Competitor— Illegal Acts—Injunction, 90 A.L.R.2d at page 63. Under that view any lawyer or group of lawyers would be authorized to file actions to enjoin the unlicensed competitor.

My views suggesting judicial restraint stem from early constitutional concepts. In State ex rel. Haskell, Governor v. Huston, Judge, 21 Okl. 782, 815, 97 P. 982, 995 (on rehearing), this court said:

"* * * Judicial legislation is not in accord with popular institutions. Everything in nature legislative, when not incidental to judicial administration, is by express organic provision denied to the judiciary. Section 1, art. 4 (Bunn's Ed.) § 50 [Const.]." Now Article 4, § 1, Oklahoma Constitution.

In the fifth paragraph of the syllabus in In re County Com'rs of Counties Comprising 7th Judicial District, 22 Okl. 435, 98 P. 557, this court held:

"This court has no authority to exercise legislative power that is neither a means appropriate nor necessary to the judicial or supervisory powers granted to it by the Constitution."

In the second paragraph of the court's syllabus in In re Assessment of Kansas City Southern Ry. Co., 168 Okl. 495, 33 P.2d 772, this court held:

"The legislative branch of government is not authorized to confer upon this court powers which are primarily legislative or administrative and not incidental to the discharge of any legitimate judicial functions except as provided by the Constitution."

This court's power, whether legislative or judicial, must be exercised within the limitations imposed by our Constitution. Article 2, § 2, Okl.Const., provides that "All persons have the inherent right to * * * the gains of their own industry." In State ex rel. Short, Atty. Gen. v. Riedell, 109 Okl. 35, 233 P. 684, 42 A.L.R. 765, we held:

"House Bill No. 204, Session Laws of 1917, c. 5, known as the Accountancy Act * * * in so far as it prohibits uncertified accountants from holding themselves out as professional or expert accountants or auditors for compensation or engaging in the practice of that profession, is in conflict with the spirit and express provision of the Constitution and void, in this, that it abridges the right of private property, and infringes upon the right of contract in matters purely of private concern bearing no perceptible relation to the general or public welfare, and therefore tends to create a monopoly in the profession of accountancy for the benefit of certified accountants, and denies to uncertified accountants the equal protection of the laws and the enjoyment of the gains of their own industry."

See also Whetsel, County Attorney v. Wood, 207 Okl. 193, 248 P.2d 612 (licensing watch repairmen), and Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, (involving "liberty" and "property" concepts of the Fifth Amendment), and 36 Am. Jur.2d Franchises, § 3.

Other provisions of our Constitution suggest caution in the decisions of this court. In the Preamble it is said that we establish this Constitution in order "to promote our mutual welfare and happiness * * *." In Article 2, § 1 it is provided:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change not be repugnant to the Constitution of the United States."

Since our decision in this case authorizes court action to regulate the unlicensed practitioner which could arise in connection with numerous legitimate occupations and businesses we should be guided in the decisional process by what is promotive of the mutual welfare and happiness of the people, whose government we serve. In this connection the decision in State Bar of Arizona v. Arizona Land Title & Trust Co., 90 Ariz. 76, 366 P.2d 1, and the reaction of the people one year later, reflected by the adoption of Article 26, § 1, Arizona constitution, is in point.

In Article VII of the Rules Creating and Controlling the Oklahoma Bar Association, 5, Ch. 1, App. 1 (Vol. 1, O.S.1971, page 439) provision is made for a budget committee, hearings, and review by this court. It is provided therein that "The Supreme Court shall review said proposed budget to determine if the proposed items of expenditure are within the Court's police powers and necessary in the administration of justice." This provision was intended to confine our use of court imposed bar dues to those activities which are necessary in the administration of justice. If actions to suppress the unlicensed practitioner are necessary in the administration of justice it is appropriate to require lawyers to finance them. However, if the actions are for the benefit of the public and not related to the administration of justice it is only fair that the public should finance the operation. On the other hand if the actions are for the benefit of lawyers and not related to the administration of justice it is only fair and proper that lawyers provide the finances outside the framework of the Oklahoma Bar Association.

In the Legislature's Integrated Bar Act (enacted 1929—repealed in 1939) it was provided in Sec. 46 (Sec. 4255 O.S.1931) that no person shall practice law in Oklahoma unless he is an active member of the State Bar. In Sec. 48 (Sec. 4257 O.S.1931) it was provided that any person, not an active member of the Bar, who practiced law in Oklahoma would be guilty of a misdemeanor. Opinions of this court written during that period (1929–1939) would necessarily be influenced by those provisions.

The procedure herein suggested would not leave the public entirely helpless. If an unlicensed practitioner is so incompetent as to become a public nuisance his activities may be enjoined. Kenyon v. Edmundson, 80 Okl. 3, 193 P. 739; Balch v. State, 65 Okl. 146, 164 P. 776; Mackey v. Aycock, 83 Okl. 175, 201 P. 365; and 12 O.S.1971, § 1397. We have held that an unlicensed practitioner for hire is liable to his employer for damages caused by his negligent preparation of notes, deeds, and mortgages. Latson v. Eaton, Okl., 341 P.2d 247.

IRWIN, Justice (concurring in results).

I recognize that there is cited in the majority opinion numerous decisions of our sister states and that those decisions are cited for the purpose of illustrating what other states have done in reference to the unauthorized practice of law: and I also recognize that the majority opinion may not be construed as meaning that this Court would necessarily follow those decisions. However, since the majority opinion recognizes that whether penalties should be invoked upon the theory that there is being conducted an unauthorized practice of law depends upon the facts and circumstances in each particular case, I am of the view it is unnecessary to discuss those cases which are not necessary in disposing of the issues presented in the instant proceedings.

I concur in the results reached by the majority of my associates that the Judicial Department is vested with the power and authority to control and regulate the practice of law and to prevent the intrusion of unlicensed persons into the practice without regard to whether their acts are "forensic" or "non-forensic". I also concur in the results reached that defendants should not be prohibited from conducting their activities in the manner in which the record indicates they are conducting their activities.

In the conduct of numerous business activities, some elements of law are involved and the successful operation of those businesses not only require the application

of legal principles but the completion of documents that may be of some legal consequences. In my opinion, the completion of such documents, which is merely incidental to the overall operation of the business, is not sufficient grounds for the imposition of penalties upon the theory that it constitutes the practice of law by unlicensed practitioners.

Although the majority opinion may not necessarily be bottomed upon the above reasoning, a similar theory is alluded to in the majority opinion.

I am authorized to state that Mr. Vice Chief Justice DAVISON concurs in the views herein expressed.